STATE OF NORTH CAROLINA

COUNTY OF MECKLENBURG

JOHN S. GAYNOE, on behalf of himself
and all others similarly situated,

Plaintiff,

v

FIRST UNION DIRECT BANK, N.A.,

Defendant.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
97 CVS 16536

ORDER and OPINION

{1}     These matters are before the Court on Defendant's motion for summary judgment, Defendant's motion for partial summary judgment, Plaintiff's cross motion for summary judgment, Plaintiff's motion for class certification, and Defendant's motion to strike. For reasons explained below, Defendant's motions for summary judgment and partial summary judgment are granted. Because the Court grants Defendant's motions for summary judgment, it does not reach the motion for class certification or Defendant's motion to strike. Plaintiff's motion for summary judgment is denied.

*Girard & Green, LLP, by Gordon M. Fauth, Jr. and Robert S. Green; Michaels Jackson & Oettinger, P.A., by Gary W. Jackson and Paul R. Dickinson, Jr., for Plaintiff John S. Gaynoe.*

*James McElroy & Diehl, P.A., by Edward T. Hinson, Jr.; Pope & Hughes, P.A., by J. Preston Turner, for Defendant First Union Direct Bank, N.A.*

# I

{2}     This case arises out of First Union Direct Bank's ("FUDB") use of standardized brochures ("Brochure") with attached credit card applications ("Application") and standardized credit card agreements ("Agreement") as a part of its "Valuable Choice" program. The Application/Brochure presented six different credit card options ("Options") by mixing four different interest rates with three different annual fees.[FN1] Four Options were listed in the brochure: 1) the Standard Prime Option, 2) the Gold Prime Option, 3) the Customized Option and 4) the Low Rate Option. The remaining two Options were created by the applicant's choice of either a gold or a standard card in the Low Rate or Customized Options. All the Options were identified in the "Credit Terms and Conditions" section on the back of the Application. Hence there were three types of credit cards: Prime, Customized, and Low Cost, each available in either a gold or standard card. Terms stated in the Brochure established that a gold card afforded a higher credit limit. Under the Low Rate Option, the applicant would choose the lowest available interest rate and the highest available annual fee. At the opposite end of the spectrum, the Gold Prime Option, the applicant would choose the highest interest rate but be charged no annual fee.

{3}     The first of these Applications was printed and available in 1994 and proffered at branch office locations. The six Options were listed at the top of the Application, divided vertically by the Option and horizontally by the type of card (standard or gold). Under the phrase "I am requesting" the applicant was instructed to "check one of the credit card options below." Above the signature line of the Application was the statement: "I agree to the terms and conditions on the other side." By his or

her signature, the applicant agreed to the Credit Terms and Conditions located on the back of the Application which read in relevant part: "I agree to abide by the selected interest rates, fees, charges and options in this application and by the terms and conditions of the FUDB Credit Card Agreement that will be mailed to me."

{4}     After approving an Application, FUDB mailed the credit card and credit card Agreement to the new cardholder.  The Agreement contained the following relevant provisions:

> This Agreement and Disclosure statement contains the terms and disclosures which apply to my VISA or MasterCard. . . .
>
> Amendments.  You may change any part of this Agreement at any time, as long as you give me advance written notice as required by law.  Any change in terms will apply to my outstanding balance existing as of the effective dates as well as to all charges made after that date.
>
> Cancellation.  I can cancel my Account at any time. . . . You may cancel this Agreement at any time.  However my obligation under this Agreement and any changes made prior to cancellation will continue to apply until I have paid you all the money I owe on the account.

The Options listed on the Application were also listed in the Agreement with the following language:

> The MONTHLY PERIODIC RATE (MPR) and ANNUAL PERCENTAGE RATE  (APR) to be used are determined by the option below that I have indicated on my application. . . .
>
> Annual Account Fee. . . The annual fee is determined by the option I have indicated on my application.

{5}     When a credit card with an annual fee was issued, FUDB charged the annual fee in the first month of issuance and, as indicated in FUDB's Agreement, "annually in the month [that the] Card was issued."

{6}     John Gaynoe, purporting to represent the potential class, applied for his FUDB credit card in combination with instant credit reserve accounts in July 1993.  This application was titled "Credit Card and ICR Application."  His credit card application was not part of a Valuable Choice Brochure.  In his 1993 application, he agreed to pay an annual fee of $39 with an annual percentage rate of prime plus 6.9 percent.  Mr. Gaynoe's application also listed six different credit card options, divided horizontally by the Option and vertically by the type of card.  The text "For my credit card account I am requesting" was adjacent to the listing and "check boxes" were beside each Option.   The Options available at that time were labeled Prime, Rebate and Fixed.  These options also consisted of a sliding scale of interest rates and annual fees similar in design to that of the subsequent Valuable Choice Options.

{7}     Subsequently, in May 1994, Mr. Gaynoe orally requested a decrease in his annual percentage rate to prime plus 2.9 percent, with no change in his annual fee; this rate corresponded to the Low Rate Option advertised on FUDB's Valuable Choice Application/Brochure available at that time.  When the rate was reduced, Mr. Gaynoe combined the outstanding balances in his ICR and other credit accounts and transferred those balances to his credit card account.  Mr. Gaynoe does not claim to have submitted an Application when this changed was effectuated.  Nor was Mr. Gaynoe charged the $15 "Product Conversion Fee" FUDB identified in the Agreement as a charge that will "be posted to [the] account each time [a customer] elect[s] to change [a] credit card option."  The Agreements applicable to Mr. Gaynoe's account were identical in all material respects to the Agreements applicable to the

Valuable Choice applicants.

{8}     Although FUDB records indicate that Mr. Gaynoe requested the Low Cost Option rate change in May 1994, the lower interest rate was not applied to his account until February 1995.  However, credits applied to his account on the January 1995 statement reflect adjustments made to his credit and ICR or retail accounts to give him the benefit of the lowered interest rate retroactively to May 1994.

{9}     From July 1993 until the closing of Mr. Gaynoe's account in 1997, FUDB charged the annual fee to Mr. Gaynoe's account annually in July. The annual fee for Mr. Gaynoe's account never varied from $39.

{10}    In February 1997 FUDB sent notice (the "Amendment") to Mr. Gaynoe that effective April 1, 1997, the annual percentage rate on his account would be prime plus 11.9 percent and his annual fee would be $39.  This Amendment resulted from FUDB's decision to re-price cardholder accounts because of an increase in the cost of doing business.  The Amendment listed a toll-free customer relations number under which a specially bordered section of the Amendment contained the following statement:  "As with any change of terms, if you do not wish to continue your Account under the above new terms, we will close your Account and permit you to pay the outstanding balance under the terms in effect before the change in terms."

{11}    In his deposition testimony Mr. Gaynoe admits that he "was aware of the fact that [he] had two options, to keep the card open and jack up the rate, or just not use the card anymore and just pay it off at the old rate."  (Gaynoe Dep. at 119.)

{12}    Upon receipt of the re-pricing notice, Mr. Gaynoe called FUDB representatives to complain about the Amendment.  He claims that he was orally advised that the Amendment would not apply to him.  Mr. Gaynoe continued to use his credit card.  However, contrary to the oral representations allegedly made by the FUDB representatives, Mr. Gaynoe's monthly statements reflected interest charges at the Amendment rates after April 1, 1997.  Mr. Gaynoe does not claim that he did not receive his credit card statements.  He continued using his credit card and took no further action until August 1997 at which time he paid his account in full.  Mr. Gaynoe is not seeking enforcement of this oral agreement.[FN2]  Mr. Gaynoe also wrote a letter on September 3, 1997 to Mr. Crutchfield, CEO of First Union Corporation, objecting to the Amendment.

{13}    Plaintiff seeks certification of the following class: "[A]ll persons who opened credit card accounts with FUDB under the Valuable Choice Program, whose annual percentage rates were, during a period beginning four years prior to the date of the complaint and running to the present (the Class Period), increased by FUDB to a value above that chosen by the customer."[FN3]

{14}    Plaintiff and Defendants agree that FUDB amended 59,296 Valuable Choice customer credit card accounts.[FN4]

# II

{15}    On August 16, 1999, Judge John M. Gardner heard Plaintiff's motion for class certification. He suggested that summary judgment motions be heard in conjunction with class certification.  On January 11, 2000, Judge Gardner heard Defendant's motion for summary judgment and additional arguments for class certification.  Judge Gardner subsequently resigned from the bench without having ruled on either motion.

{16}    This matter originally came on for hearing before the undersigned on Plaintiff's motion for class certification.  Since this case presents the unusual situation in which a determination of the class definition and Mr. Gaynoe's membership therein involves the determination of substantive legal issues impacting summary judgment, this Court then suggested that the parties submit and brief cross

motions for summary judgment. Like Judge Gardner, this Court believed it best to be fully informed of the parties' positions on both issues at the same time. Subsequently, Defendant filed a motion for summary judgment, and Plaintiff filed his motion for summary judgment.

# III

{17}    The Agreement clearly states, and the parties are in agreement, that Georgia law governs this case. The State of Georgia adopted a statute specifically governing the issuance of credit cards. Ga. Code Ann. § 7-5-4, *et seq.* (1996) ("Georgia Credit Card Act") states in relevant part:

> (a)(1) Notwithstanding the provisions of any other law prescribing, regulating, or limiting interest rates, any domestic lender or credit card bank may charge and collect in connection with a credit card account:
>
> (A) Finance charges at such periodic interest rate or rates computed or imposed on the outstanding balances on the credit card account in any manner as provided in the written agreement governing such credit card account, and such periodic interest rate or rates may vary from time to time in accordance with a schedule or formula contained in such agreement . . . .
>
> . . . .
>
> (b) The terms and conditions contained in the written agreement governing the credit card account between the domestic lender or credit card bank and the debtor shall be deemed to be material to the determination of interest, including, but not limited to:
>
> . . . .
>
> (3) All other terms and conditions of such written agreement.
>
> (c) A credit card account between any domestic lender or credit card bank and a debtor shall be governed solely by the laws of the State of Georgia and federal law unless otherwise expressly agreed in writing by the parties. A domestic lender or credit card bank may, as specified in the written agreement governing a credit card account, modify in any respect any terms or conditions of such credit card account, upon such prior written notice of such modification as specified by the terms of the written agreement governing the credit card account or by the Truth in Lending Act (12 U.S.C. Section 1601, et seq.). Any such notice provided by a domestic lender or credit card bank shall specify that the debtor has the right to surrender the credit card whereupon the debtor shall have the right to continue to pay off his credit card account in the same manner and under the same terms and conditions as then in effect. The debtor's failure to surrender the credit card prior to the modification's becoming effective shall constitute a consent to the modification.

{18}    Georgia statutory code also contains this provision: "The General Assembly finds and declares that the sound, efficient, and responsive operation of financial institutions is essential to the livelihood of the people of this state and to the stability and growth of the economy of this state and region and vitally affects public interest." O.C.G.A. § 7-1-2 (1996).

# IV

{19}    Pursuant to Rule 56(c) of the North Carolina Rules of Civil Procedure, summary judgment

shall be rendered if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to judgment as a matter of law. *See* N.C. R. Civ. P. 56(c); *see also Beam v. Kerlee*, 120 N.C. App. 203, 209, 461 S.E.2d 911, 916 (1995) (recognizing that summary judgment is appropriate only when "there is no dispute as to any material fact"), *cert. denied,* 342 N.C. 651, 467 S.E.2d 703 (1996). As moving parties, defendants have "the burden of showing there is no triable issue of material fact." *Farrelly v. Hamilton Square*, 119 N.C. App. 541, 543, 459 S.E.2d 23, 25-26; *see also Taylor v. Ashburn*, 112 N.C. App. 604, 606, 436 S.E.2d 276, 278 (1993), *cert. denied,* 336 N.C. 77, 445 S.E.2d 46 (1994). In determining whether that burden has been met, the court "must view all the evidence in the light most favorable to the non-moving party, accepting all its asserted facts as true, and drawing all reasonable inferences in its favor." *Lilley v. Blue Ridge Elec. Membership Corp.*, 133 N.C. App. 256, 258, 515 S.E.2d 483, 485 (1999), *cert. denied,* 350 N.C. 833, 1999 N.C. Lexis 949 (1999); *see also Murray v. Nationwide Mut. Ins. Co.,* 123 N.C. App. 1, 472 S.E.2d 358, 362 (1996), *cert. denied,* N.C. 344, 483 S.E.2d 173 (1997).

{20}    To grant summary judgment, the court must conclude that no reasonable jury could find in favor of the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. When considering a motion for summary judgment, the judge must determine whether a fair-minded jury could return a verdict for the non-movant on the evidence presented. *See Merck-Medco Managed Care, LLC v. Rite Aid Corp.*, No. 98-2847, 1999 U.S. App. LEXIS 21487, at *10 (4th Cir. Sept. 7, 1999) (quoting *Anderson*, 477 U.S. at 252).

{21}    Since Georgia law governs the cardholder Agreement, the Court must look to Georgia statutes and case law to determine how the Georgia courts would construe this contract. Georgia statutes provide that "the construction of a contract is a question of law for the court." *See* O.C.G.A § 13-2-1 *et seq.* In construing a contract, the Georgia courts first determine whether the terms are ambiguous. *See Hayden v. Signari,* 220 Ga. App. 6, 467 S.E.2d 590 (1996). If the terms are ambiguous, expert testimony is admissible to assist the trier of fact. *See id.* However, if no ambiguity exists it is error to receive expert testimony regarding contract construction. *See id.* "It is axiomatic that a contract should be construed by the court where the language is undisputed but the meaning of that language is in dispute." *Board of Regents v. A. B. & E., Inc.,* 182 Ga. App. 671, 673, 357 S.E.2d 100, 102 (1987), citing OCGA § 13-2-1. It is the responsibility of the court to determine whether an ambiguity exists. *Salvatori Corp. v. Rubin*, 159 Ga. App. 369, 283 SE2d 326 (1981). "If the contract does not require disentanglement of the language by a jury, i.e., the words used are plain and clear in their common usage, it remains the duty of the trial court to look to the language of the contract with a view to effectuating the intent of the parties." *Board of Regents v. A. B. & E., Inc.,* 182 Ga. App. 671, 673, 357 S.E.2d 100, 102 (1987), citing *Southern Fed. Savings &c. Assn. v. Lyle*, 249 Ga. 284, 290 S.E.2d 455 (1982).

{22}    There are no material factual disputes in this case. The parties disagree over how the contract is to be construed.

## A

{23}    The parties generally agree that the contract includes both the Application and the Agreement. Plaintiff's claim is premised upon a construction of the contract that finds that the Application creates a contract for one year at a fixed annual percentage rate - which cannot be modified during the year. Plaintiff asserts that by offering on the one Application choices of a sliding scale of annual percentage rates combined with annual fees, both of which are couched in annual terms, FUDB created a binding contract between it and the applicant for the extension of credit at a fixed rate for one year, because the original annual fee was paid in consideration for the interest rate to which it was combined. Plaintiff contends that by changing his interest rate during the year in which an annual fee was already

paid, FUDB breached the contract.[FN5]  Under Plaintiff's construction the termination and amendment provisions in the Agreement are subservient to the fixed time and rate provisions allegedly found in the Application.  Plaintiff argues that the one-year fixed rate contract is unambiguously clear, but that if there is an ambiguity the Georgia courts would permit a jury to determine the terms of the contract applying the "reasonable expectations" of the average member of the public.  In order to follow this construction process this Court would have to find that the Georgia courts would apply the Restatement (2nd) of Contracts, § 211 to this case.[FN6]  Further, Plaintiff claims the duty of good faith and fair dealing inherent in every contract prevented FUDB from amending the contract to deprive Plaintiff of his chosen annual percentage rate during a year for which he had been charged the $39 annual fee.

{24}    Conversely FUDB argues that the both Georgia Credit Card Act and the Agreement explicitly allow FUDB to change the credit terms applicable to a cardholder's account at any time after issuance subject to the notice requirements of the Georgia Credit Card Act and the federal Truth in Lending Act ("TILA").  Under FUDB's construction the annual fee is consideration for the extension of credit, and the Agreement specifically provides that it may be terminated by either party or amended as provided by law.

{25}    Although the parties present no Georgia case directly addressing a dispute of this nature, Georgia case law and cases from other jurisdictions provide some guidance on the central issue in this case: the nature of the relationship between a cardholder and an issuer.  Georgia case law describes the general rules of this relationship in *City Stores Co. v. Henderson,* 116 Ga. App. 114, 156 S. E.2d 818 (1967).  In *City Stores,* Plaintiffs brought an action for tortious misconduct against the issuing department store for allegedly revoking Plaintiff's credit card without prior notice.  The court stated,

> The issuance of a credit card is but an offer to extend a line of open account credit.  It is unilateral and supported by no consideration.  The offer may be withdrawn at any time, without prior notice, for any reason or, indeed for no reason at all, and its withdrawal breaches no duty for there is no duty to continue it – and violates no rights.  Acceptance or use of the card by the offeree makes a contract between the parties according to its terms, but we have seen none which prevents a termination of the arrangement at any time by either party.

*Id.* at 120-21, 156 S. E.2d at 823.

{26}    The Georgia interpretation of the credit card relationship was adopted and slightly modified in *Garber v. Harris Trust Savings Bank*, 104 Ill. App.3d 675, 432 N.E.2d 1309 (1982).  In *Garber,* plaintiffs charged defendants with "breaching the provisions of the cardholder agreement . . . by changing the terms on which" defendants would issue credit.  *Id.* at 677, 432 N.E.2d at 1310.  Plaintiffs further alleged that the changes in the cardholder agreement were void for lack of consideration.  *Id.*  Similar to the case at bar, defendants in *Garber* sent notices to cardholders that interest rates and annual fees would increase on a certain date and that the effect of the changes would only take place if the cardholder used the card after that date.  *Id.*  While plaintiffs asserted that the cardholder agreement governing the account was a binding agreement, the court found that: "[A] separate contract is created each time the card is used according to the terms of the cardholder agreement at the time of such use; . . . the cardholder agreements were subject to modification at will; and . . . in any event, consideration was given for the modifications."  *Id.* at 678, 432 N.E.2d at 1311.  The *Garber* court based its decision in part on the at-will termination, cancellation and amendment provisions in the cardholder agreement that are similar to those in the FUDB Agreement.

{27}    More recently, in *Grasso v. First USA Bank,* 713 A2d 304 (Del. 1998) the Delaware Supreme Court utilized an analysis similar to *City Stores* and *Garber* in defining the relationship between an issuing bank and a card holder.  In *Grasso*, plaintiff sued defendant for breach of contract after defendants changed the terms of plaintiff's credit card account.  *Id.*  The facts in *Grasso* are similar to

the case at bar in several respects.  First, like the case at bar, Grasso claimed that the contract between her and the issuing bank was set forth in the original solicitation.  *Id.* at 307.  Second, Grasso claimed the language in the solicitation agreement promised an initial introductory rate, a low fixed rate "thereafter" and no annual fee, and that First USA breached the "thereafter" and the "no annual fee" terms.  *Id.*  Third, the solicitation, like FUDB's Application, expressly subjected the applicant to the terms and conditions of the credit card agreement.[FN7]  Finally, the credit card agreement sent to Grasso with her credit card contained a governing law provision, as well as the amendment and at-will termination clauses found in the FUDB Agreement.  *Id.* at 305-06.  Defendants in *Grasso* claimed that the credit card agreement represented the contract between it and the plaintiff, and the credit card agreement expressly allowed it to make amendments to the agreement.  *Id.* at 307.

{28}    Applying Delaware contract law to the specific language of both the solicitation and the credit card agreement, the *Grasso* court found that the Agreement was the contract and the solicitation "was [an offer] to open a credit card/charge account which would be subject to an Agreement which would be sent out with the credit card.  Use of the credit card would constitute acceptance of the terms of the Agreement."  *Id.* at 308-310.  Therefore, plaintiff's acceptance and use of defendant's credit card subjected her to the card member agreement that, in turn, expressly allowed defendant to amend the agreement, subject to applicable law.  *Id.*

{29}    Similar to *Grasso,* the solicitation sent to Plaintiffs in the present case contained terms for which a credit card account could be opened.  Plaintiffs do not argue that FUDB was bound to accept an application should an applicant's credit history prove inadequate; FUDB's right to examine the applicant's credit history would indicate that a contract was not formed by the Application alone.  By filling out the Application, Plaintiff accepted the terms offered in the Application.  Those terms included the disclosure found on the Application, which stated, "I agree to abide by the selected interest rates, fees, charges and options in this application and by the terms and conditions of the FUDB Credit Card Agreement that will be mailed to me."  By sending a credit card to the applicant, FUDB completed the offer and reincorporated the terms of the Agreement.  By signing the Application and accepting and using the credit card the Plaintiff expressly agreed to the terms of the Agreement mailed with the card.  Hence, any contract between the parties included the terms of the Agreement.

{30}    Like *Grasso,* the Agreement at issue in this case contained an amendment clause and an at-will cancellation clause.  The amendment clause is consistent with the Georgia Credit Card Act which states in relevant part:  "A domestic lender or credit card bank may, as specified in the written agreement governing a credit card account, modify in any respect any terms or conditions of such credit card account, upon such prior written notice of such modification as specified by the terms of the written agreement governing the credit card account or by the Truth in Lending Act (12 U.S.C. Section 1601, *et seq.*)."  O.C.G.A. § 7-5-4.  Indeed, Plaintiff does not claim modification of the Agreement was a violation of the Georgia Credit Card Act or the Truth in Lending Act.  The statutory scheme in Georgia appears explicitly to contemplate the right of credit card companies to change credit terms at any time, because it specifies the limitations to that right that the legislature deemed necessary to protect consumers.

{31}    Following *City Stores, Garber, Grasso* and Georgia's statutory scheme, this Court concludes that the courts of Georgia would hold that in this case the issuance of a credit card to Mr. Gaynoe constituted an offer by FUDB to extend him an open line of credit.  The acceptance of that offer by Mr. Gaynoe subjected him to the Agreement that expressly permitted FUDB to amend, modify or terminate the credit terms subject to the restrictions of the Georgia Credit Card Act.

{32}    The general rule covering the relationship between a card issuer and cardholder is also well grounded in economic reality.  The cardholder is not required to use the card, and by making timely payments, many never owe any interest.  The cardholder may switch credit sources almost at will.  Economic conditions are not fixed; interest rates and competition change.  The provision of consumer

credit does not take place in a static environment. Credit issuers require flexibility to operate. Forcing an issuing bank to adhere to credit terms in an unfavorable economic environment would not promote "the sound, efficient, and responsive operation of financial institutions [which] is essential to the livelihood of the people of [Georgia] and to the stability and growth of the economy of [that] state and region" as set forth in O.C.G.A. § 7-1-2. The case law exemplified by *City Stores, Garber* and *Grasso* is recognition of this underlying dynamic credit relationship.

{33}    Plaintiff seeks to avoid FUDB's right to amend the Agreement by asserting that the statement of the options appearing on the Application, combined with the repeated use of the terms *annual fee* and *annual interest rate*, create a contract for a fixed rate for one year each time the annual fee is paid. Plaintiff contends that by offering choices between different combinations of fees and rates, FUDB effectively offered a guaranteed rate for one year for those applicants choosing to pay an annual fee. Stated differently, Plaintiff asserts that the annual fee is given in consideration for the lower interest rate, and that therefore, if the annual fee is charged to the credit card account, the interest rate may not be changed during the year for which that annual fee applied. Plaintiff contends that it is the existence of the choices expressed in annual percentage rates and annual fees that remove Plaintiff from the general rule that credit card terms may be amended subject to statutory restrictions.

{34}    This Court concludes that the existence of choices did not guarantee Mr. Gaynoe a certain interest rate for one year, but instead served to offer flexibility to applicants in how they initially obtained credit. FUDB customers were in no different legal position than other bank customers who choose between a myriad of alternative cards. Plaintiff does not argue, nor does the Court believe, that the common practice of offering choices between gold, silver, platinum, reward miles or other types of cards creates a one-year contract for each applicant who pays an annual fee. On the contrary, such offers generally constitute an offer of a line of credit on differing terms, all of which are subject to an agreement as well as applicable state and federal laws. The fact that FUDB's choices were available on one Application or set forth in one Agreement as opposed to separate applications and agreements for each type of card neither changes the application of the existing law nor creates an ambiguity. There was no language in the Application promising or guaranteeing any rate for any period of time. Conversely, the Agreement contained express language permitting termination, modification or amendments to the line of credit. The presentation of different options on one piece of paper did not, under the circumstances of this case, create a different contract from that which normally exists. Finally, the possibility of disparate treatment, as indicated below, is further support for the Court's determination that the availability of choices among various credit arrangements was just that – selections from which the applicant could choose for the initial issuance of a card and credit – and was not intended to create an annual contract for cardholders.

{35}    For several reasons, the Court declines to apply the Restatement 2nd of Contracts § 211, generally applicable to standardized contracts, as urged by the Plaintiff to ascertain the "reasonable expectations" of the average cardholder. First, the Court finds, based upon existing Georgia law and the language and structure of the agreement between the parties, that the contract is not ambiguous and provides for amendment in accordance with state and federal law. Second, there is no basis upon which the Court can conclude that the Georgia courts have or would adopt this particular section of the Restatement under the circumstances of this case; it is more likely that the Georgia courts would look to the statutory scheme specifically enacted by the legislature to govern the relationship between credit card issuers and credit cardholders. Third, as explained below, application of this section under the circumstances of this case would not result in equal treatment of the applicants who filled out identical Applications.

{36}    Restatement (Second) of Contracts, § 211 governing standardized agreements states in comment (e):

> e. *Equality of treatment.* One who assents to standard contract terms normally
> assumes that others are doing likewise and that all who do so are on an equal

footing. . . . [C]ourts in construing and applying a standardized contract seek to effectuate the reasonable expectations of the average member of the public who accepts it. The result may be to give the advantage of a restrictive reading to some sophisticated customers who contracted with knowledge of an ambiguity or dispute.

{37}    As indicated, Plaintiff seeks to certify the following: "[A]ll persons who opened credit card accounts with FUDB under the Valuable Choice Program, whose annual percentage rates were . . . increased by FUDB to a value above that chosen by the customer." Based on the Application, the members of this class include applicants for all six types of credit cards – those who did opt to pay an annual fee as well as those who chose a higher interest rate and no annual fee. However, in oral argument Plaintiff claimed that only those persons who paid an annual fee were entitled to class status. According to Plaintiff's argument, only those cardholders paying annual fees paid consideration and thereby entered into binding contracts with FUDB for the year in which their annual fee was paid; those who did not choose a card with an annual fee but instead received a higher interest rate did not give consideration and were not entitled to a fixed rate for any twelve-month period. Conversely, this Court can conceive an argument being made by those paying a higher interest rate that by choosing the higher interest rate they were in effect paying an equivalent "annual" fee in the form of higher interest charges over the course of the twelve-month period. Those paying a higher interest rate would argue that they too paid consideration to lock in their annual percentage rate, albeit in a different form, thus entitling them to the same contract as those who paid a fixed annual fee once a year. Plaintiff may have recognized the pitfalls of presenting such an argument. Nonetheless, applying Plaintiff's argument, the same standardized Application would not put all applicants on equal footing. The Restatement advises against such disparate treatment.

{38}    The application of Plaintiff's theory is also complicated by the requirements of federal law. Under Plaintiff's theory, if a customer is offered choices of credit terms and the phrases "annual fees" and annual interest rates" are used to represent different choices, the terms of the credit cannot be changed in any manner adverse to the cardholder for one year. As a practical matter, TILA[FN8] requires that card issuers provide cardholders information in terms of "annual fees" and "annual percentage rates." Failure to use these specific terms for these types of fees violates the federal statute. To hold that the use of terms mandated by federal law creates a one-year or annual contract would severely limit product offerings by card issuers in a way unintended by the federal statute and contrary to the intent of the Georgia statute.

{39}    The Court holds that as a general rule, and in this case, an annual fee is imposed as a charge for the issuance or availability of credit that is charged to the customer on an annual basis. The imposition of an annual fee is not "consideration" for favorable APR terms. Neither TILA nor Georgia statutory law defines a specific purpose for an annual fee. Additionally, unlike North Carolina law[FN9], Georgia law has no provision for the return of the annual fee if a credit card account is terminated in the year in which the annual fee applied. Likewise, there is no provision in either the Application or the Agreement that any part of the annual fee is refundable if the card is canceled prior to the end of twelve months. The absence of a refund provision supports the view that an annual fee is a charge for the issuance of a card and the availability of credit. Plaintiff argues that if FUDB could terminate or amend the card the day after issuance, the card member has received no consideration for the annual fee. The facts of this case do not support Plaintiff's argument. First, the mandatory notice provisions in TILA and the Georgia Credit Card Act guarantee that the cardholders' rates remain unchanged until the expiration of the notice period. Second, Mr. Gaynoe clearly received consideration for the fee he paid for the issuance of his card: He received credit he used frequently and had the right to pay off his existing balance at the prior rate if he canceled his card before the Amendment took effect. Finally, any bank that engaged in a pattern and practice of luring customers with the advertisement of low rates only to raise the rates immediately (bait and switch) would be subject to various unfair trade practice sanctions.

{40}   Although not controlling, this Court also found federal tax law helpful in determining how annual fees are viewed in general.  The current view of the United States Tax Court is that non-refundable annual fees are generally not "fees paid for services to be performed over time, but rather in consideration of issuing a card and establishing a credit limit." *See Signet Banking Corp. v. Commissioner,* 118 F.3d 239 (4th Cir. 1997); *see also* Rev. Rul. 70-540, 1970-2 C.B. 101; G.C.M. 39434 (1985).  A determination of the nature of annual fees is important for the proper reporting of income to the taxing authorities.  Hence from the tax court perspective, the annual fee is charged for the purpose of establishing a line of credit and not for maintaining the account throughout the year for which the annual feel is paid.  From this perspective, the Plaintiff paid his annual fee, neither for a certain interest rate nor to have his card for a fixed period, but instead for an extension of credit.  Likewise, those who did not choose an annual fee Option were charged a commensurate higher interest rate to compensate FUDB for extending to them a line of credit.  In either scenario, there is no indication that an annual fee is given to lock in credit terms.

{41}   This Court also considered the import of the at-will cancellation provision.  The Agreement states: "Cancellation.  I can cancel my Account at any time . . . .  You may cancel this Agreement at any time.  However my obligation under this Agreement and any changes made prior to cancellation will continue to apply until I have paid you all the money I owe on the account."  Plaintiff agrees that he could have canceled the credit card account at any time.  The Agreement gave FUDB the same right.  It seems anomalous that either party could cancel the credit card account at any time and yet FUDB was not allowed to modify the Agreement.  In effect, FUDB could have canceled the card and then offered credit at the new terms.  Instead, FUDB gave notice of the amended terms and gave Plaintiff the option of canceling the card and preserving the terms in effect prior to the amendment on the outstanding balance.

{42}   Finally, this Court notes the terms of the Amendment.  Plaintiff does not allege that the Amendment violated either Georgia or federal laws but claims that FUDB, having enticed applicants to transfer balances from other cards by offering a low rate, should be prevented from unilaterally increasing the rate.  According to Georgia law the terms of any amendment must include a provision allowing the credit cardholder to cancel his card and pay at the prior rate.  Only by keeping or using the card after the effective date of the amendment is the account subject to the new terms.  This underscores three points:  1) that Georgia law contemplates amendments in on-going credit card accounts; 2) the amendment acts as a termination of the old Agreement and an offer to accept the new Agreement; and 3) the cardholder is protected from change to the extent he or she has already accessed the line of credit.

## B

{43}   Although this Court does not reach the issue of class certification, the Court will rule on Defendant's motion for partial summary judgment concerning limitation of damages.  Plaintiff's proposed measure of damages raises two issues that would greatly impact class certification in this case.  The recovery Mr. Gaynoe seeks on behalf of himself and all others similarly situated is the difference between the interest on his outstanding balance after April 1, 1997 calculated at the amended rate and the interest on the same balance calculated at the prior rate.[FN10]  He does not seek damages for credit that might have been extended at the prior rate.[FN11]

{44}   In addition to its summary judgment motion, Defendant sought, and is entitled to, at least partial summary judgment on two grounds.  First, Defendant asserts that any cardholder claiming breach of contract was required to mitigate damages following breach of any "one-year contract" with FUDB.  The Amendment was sent in February 1997, giving Plaintiff four months notice before the July 1997 annual fee was charged.  Therefore, Defendant requests partial summary judgment limiting recovery of damages to those suffered by Plaintiff before July 1997.  According to the terms of the Amendment, the annual fee for all card members subject to the Amendment would be $39.  Accordingly, Plaintiff was charged, and he voluntarily paid, a $39 annual fee in July 1997 with

knowledge of the new rates.

{45}    Plaintiff seeks to avoid this limitation by asserting that the Amendment was an ineffective revocation of the contract, and therefore the Amendment was invalid and the prior credit terms continued into the new year.  The language of the Georgia Credit Card Act directly contradicts this assertion by expressly allowing, with proper notification, amendment of the terms of credit card agreements.  Even assuming a one-year contract could be found between FUDB and its cardholders, the one-year contract ended at the completion of the twelve months for which the annual fee was applied.  Damages could not accrue beyond the end of the twelve-month period during which the amendment took effect.[FN12]  To hold otherwise would lock FUDB into a perpetual contract with Plaintiff.

{46}    Secondly, Defendant asserts that it is entitled to partial summary judgment dismissing any claim for damages by any cardholder who paid his credit card bill at the amended rate based on Georgia's "voluntary payment doctrine" found in O.C.G.A. § 13-1-13.  *See, e.g., Watts v. Promina Gwinnett Health Sys., Inc.,* 242 Ga. App. 377, 380, 530 S.E.2d 14, 16 (2000).  The doctrine states:

> Payments on claims made through ignorance of the law or where all the facts are known and there is no misplaced confidence and no artifice, deception, or fraudulent practice used by the other party are deemed voluntary and cannot be recovered unless made under an urgent and immediate necessity therefore or to release person or property from detention or to prevent an immediate seizure of person or property.  Filing a protest at the time of payment does not change the rule prescribed in this code section.

O.C.G.A. § 13.1.13.  To overcome the doctrine, Plaintiff must at least allege that the payments were not voluntary because certain material facts were not known at the time of payment, or that a valid reason existed for failure to determine the truth.  *See Watts,* 242 Ga. App. at 378, 530 S.E.2d at 16.

{47}    The doctrine has been attacked, most notably in *Gulf Life Ins. Co v. Folsom*, 256 Ga. 400, 349 S.E.2d 368 (1986), but has been invoked by the Georgia courts as recently as November 2000.  *See Telescripps Cable Company v. Welsh,* 2000 Ga. App. LEXIS 1392,  No. A00A1179 (Nov. 22, 2000).  In *Folsom,* the plaintiff overpaid due to a computer mistake but did not know the charge was applied to his account erroneously, and the plaintiff failed to investigate the charge.  *Gulf Life Ins. Co v. Folsom*, 256 Ga. 400, 349 S.E.2d 368 (1986).  The court found that "in an action for money had and received, . . . the plaintiff [can] recover a payment mistakenly made when that mistake was caused by his lack of diligence or his negligence in ascertaining the true facts and the other party would not be prejudiced by refunding the payment.  *Id.* at 402-04, 349 S.E.2d at 370-72.  North Carolina has no equivalent doctrine, but the Court must apply Georgia law in this case.

{48}    This case is distinguishable from *Folsom,* and the Court instead finds *Telescripps* controlling and indistinguishable from the facts in this case as those facts apply to Mr. Gaynoe.  In *Telescripps*, the Georgia court applied the voluntary payment doctrine to preclude recovery of overpayments by cable subscribers where their overpayments were made under a misapprehension of the law. *Telescripps Cable Company v. Welsh,* 2000 Ga. App. LEXIS 1392, No. A00A1179 (Nov. 22, 2000).  The Georgia court assumed for purposes of the decision that the cable company had overcharged its customers late charges, thus breaching its contract.  *Id.* at 6.  It held that the subscribers who paid the overcharges and did not know the charges were unenforceable were operating under a misapprehension of the law.

> Assuming, without deciding, that the late fee was not a reasonable pre-estimate, the [p]laintiffs are asserting that they did not know that the late fee was unenforceable under the law.  In other words, the [p]laintiffs are simply stating

that they made their payment under ignorance of the law. And when payment is made through mere ignorance of the law, it is not recoverable.

> When money is paid with a full knowledge of all the facts and circumstances upon which it is demanded, or with the means of such knowledge, it cannot be recovered back upon the ground that the party supposed he was bound in law to pay, when in truth he was not. He shall not be permitted to allege his ignorance of the law, and it shall be considered a voluntary payment.

*Id.* at 6-7. The Georgia court noted that the doctrine did not always apply where there was a payment made under a mistake of fact. *Id.* at 9. However it distinguished *Folsom* and applied the voluntary payment doctrine to preclude recovery by the plaintiffs.

{49}　In the instant case, the record reveals that Mr. Gaynoe made his payments voluntarily after the Amendment became effective. He did not do so under any mistake of fact. In oral argument Plaintiff's counsel was unable to state any fact about which Mr. Gaynoe was mistaken. He knew that his interest rate changed pursuant to the Amendment. Indeed, Mr. Gaynoe made payments even as he disputed the applicability of the Amendment to his account. While continuing to pay he not only sought to reinstate his prior interest rate, he even wrote the CEO of FUNB to object to the Amendment. Accordingly, under Georgia law, he cannot recover for the higher interest he or any potential class member voluntarily paid.[FN13]

{50}　The voluntary payment doctrine does not bar any claim for a pro rata share of the annual fee, since Mr. Gaynoe paid his annual fee before the effective date of the Amendment. That claim is, however, subject to dismissal under the Court's ruling that under the Agreement and applicable Georgia law, the "annual fee" represents a fee for the issuance of the card and the availability of credit.

# V

{51}　Defendants are entitled to summary judgment based upon the Court's conclusion that the contract between the parties is unambiguous and provides for the amendment of its terms subject to state and federal law. Having concluded that Mr. Gaynoe's claims are subject to dismissal and that the terms of the Application and Agreement are unambiguous, it is not necessary for the Court to rule on the motion for class certification or the motion to strike the affidavits of Robin Tomalach Lakoff, Ph.D., and Todd Bill Hilsee. Defendants are also entitled to partial summary judgment limiting damages to the twelve-month term to which the annual fee (in effect before the amendment) applied and precluding interest payments voluntarily made.

It is therefore ORDERED, ADJUDGED and DECREED:

1. Plaintiff's complaint is hereby dismissed.

2. Summary judgment is entered in favor of Defendant.

3. Partial summary judgment is entered in favor of Defendant.

4. Plaintiff's motion for summary judgment is denied.

This is the 18th day of January 2001.

_____

Ben F. Tennille
Special Superior Court Judge
for Complex Business Cases

---

[FN1] The options included:

| | |
|---|---|
| Prime Option Gold | Prime + 7.9 %, Annual Fee $0 |
| Prime Option Standard | Prime + 5.9%, Annual Fee $20 |
| Customized Option Gold | Prime + 6.9%, Annual Fee $0 |
| Customized Option Standard | Prime + 6.9%, Annual Fee $0 |
| Low Rate Option Gold | Prime + 2.9 %, Annual Fee $39 |
| Low Rate Option Standard | Prime + 2.9 %, Annual Fee $39 |

[FN2] Mr. Gaynoe's status as a potential class representative would be jeopardized by reliance on an oral agreement inconsistent with the situation of the class he seeks to protect.

[FN3] By this definition, all Applications received pursuant to the Valuable Choice program are included regardless of the option chosen by the applicant.

[FN4] Of this number the parties were unable to identify 1) how many were applicants paying an annual fee; 2) how many canceled their card after the notice of the amendment and paid the balance at the prior terms; and 3) how many were new cards in their first year of use.

[FN5] It became clear at oral argument that Plaintiff's position was that FUDB could not terminate the contract at any time during the year in which the annual fee was paid unless the cardholder was in default in one of the ways identified in the Agreement.

[FN6] Plaintiff submitted affidavits from two witnesses to establish that the average credit card applicant would reasonably expect to have a one-year contract for credit based upon the Application, Brochure, and Agreement.

[FN7] The relevant language on the *Grasso* solicitation is as follows: "I understand that the use of any card issued in connection with this offer will constitute my acceptance of and will be subject to the terms and conditions of the First USA Card member Agreement that will be sent with the card. . . . I agree to be responsible for all charges incurred according to the Cardmember Agreement. I understand that the terms of my account are subject to change as provided in the Cardmember Agreement." *Grasso v. First USA Bank,* 713 A.2d 304, 305 (Del. 1998).

[FN8] Regulation Z of TILA mandates the disclosures in a credit card application as follows:

> B       Required disclosures.  The card issuer shall disclose the items in this paragraph on or with an application or solicitation in accordance with the requirements of paragraphs (c), (d) or (e) of this section.
>
> > 1.       Annual percentage rate.  Each periodic rate that may be used to compute the finance charge on an outstanding balance for purchases, *expressed as an annual percentage rate*.
> >
> > 2.       Fees for issuance or availability.  Any annual or other periodic fee *expressed an annualized amount*, or any other fee that may be imposed for the issuance of availability of a credit or charge card, including any fee based on account activity or inactivity.

12 C.F.R. § 226.5a(b) (emphasis added).

[FN9] North Carolina statutory law requires a pro rata return of the annual fee "[s]hould any cardholder within 12 months of the *initial* imposition of an annual charge rescind his credit card contract. . . ." N.C.G.S. § 24-11 (e) (1999) (emphasis applied). Even under North Carolina law, there would be not return of the annual fee after the first year.

[FN10] Mr. Gaynoe in his summary judgment memorandum alleges that his interest overcharges exceeded $2000. Plaintiff's counsel reasserted this measure of damages at oral argument.

[FN11] Such damages would be highly speculative and would certainly vary depending on the credit worthiness of the individual cardholders. Nor would such damages be readily determinable in a class action situation.

[FN12] This ruling impacts the potential class members, because only those persons who had not completed the full year of charging at the prior rate before the Amendment became effective would be entitled any measure of damages. In this case the Amendment became effective on April 1, 1997; therefore card members charged an annual fee in the months of May 1996 through March 1997 were still within the assumed "one-year contract" period. In theory, after March 1997, all prior one-year contracts would expire and the new terms would become effective in the month in which the annual fee was charged. For Mr. Gaynoe, his "contract" expired in July 1997 and the $39 annual fee charged in July 1997 would be an Amendment term. Consequently, for class purposes there is an outside window of twelve months from which damages could be calculated: April 1997 to March 1998. Only a person paying an annual fee in March 1997 could potentially recover damages for the full twelve months.

[FN13] The effect of these two issues on class action certification is that even if the Court did not grant Defendant's motion for summary judgment, the recoverable claims could be de minimis and certification of a class would be questionable. As noted, FUDB amended 59,296 Valuable Choice accounts; however that number includes applicants applying for all options offered through the Application. Thus, the potential class members would be decreased by cardholders who did not hold credit card accounts with annual fees and it would be decreased by those who canceled their card after the notification. Additionally, the voluntary payment doctrine would eliminate interest payments made voluntarily. Finally, the Court observes that the only measure of damages left for the potential class members would be a pro rata share of the annual fee during the damages window of April 1996 to March 1997. Hence, the damages in this particular case are likely de minimis and class certification is questionable. *See Maffei v. Alert Cable TV, Inc.*, 316 N.C. 615 (1986).