**Jacqueline M. GRASSO, on Behalf of Herself and all Others Similarly Situated, Plaintiff,**

v.

**FIRST USA BANK, Defendant.**

**Civil Action No. 97C–10–144JOH.**

Superior Court of Delaware,
New Castle County.

Submitted: Feb. 10, 1998.

Argued: March 10, 1998.

Decided: April 16, 1998.

Kevin Gross, of Rosenthal, Monhait, Gross & Goddess, P.A., and Wood R. Foster, and Jordan M. Lewis (argued) of Siegel, Brill, Greupner, Duffy & Foster, P.A., Minneapolis, MN, for plaintiff.

Thomas C. Grimm, and Donna L. Culver, of Morris, Nichols, Arsht & Tunnell, and Christopher R. Lipsett (argued) of Wilmer, Cutler & Pickering, Washington, DC, for defendant.

### *OPINION*

HERLIHY, Judge.

Defendant First USA Bank has moved for summary judgment in this action challenging its proposed increase in the rate of interest on a credit card held by plaintiff, Jacqueline Grasso. She also seeks to have this dispute certified as a class action. Because the Court is granting First USA's motion, it is unnecessary to consider Grasso's class action request.

---

**92.** *Baker v. General Motors Corp.,* —— U.S. ——,   118 S.Ct. 657, 139 L.Ed.2d 580 (1998).

## FACTS

First USA is a bank located in Wilmington, Delaware, that issues credit cards to customers. As part of its business, it sends solicitation letters to potential credit card customers.

In 1993, First USA sent Grasso a credit card solicitation which included a letter and a pre-approved acceptance certificate. The actual letter Grasso received is not in the record. Several years later, she received another solicitation from USA. In her affidavit opposing First USA's motion, she states a belief that the later solicitation was "identical in all relevant respects" to the 1993 solicitation.[1] At oral argument, the parties agreed that the later solicitation's language was identical. Therefore, any quotation for or reference to solicitation language will be treated as the solicitation wording applicable to this motion. Any mention of interest rates, however, is to the interest rates in the original, not the later, solicitation.

The solicitation, in pertinent part, states:

I understand that the use of any card issued in connection with this offer will constitute my acceptance of and will be subject to the terms and conditions of the First USA Cardmember Agreement that will be sent with the card. I agree to be responsible for all charges incurred according to the Cardmember Agreement. I understand that the terms of my account are subject to change as provided in the Cardmember Agreement.[2]

The solicitation letter stated that no annual fee would be charged. In addition, it said Grasso would pay a *"low, fixed introductory annual percentage rate (APR) of 4.9%* for purchases, balance transfers and cash advances. After the introductory period, you'll continue to save with a low fixed APR of 11.90%—unlike the variable APR's other platinum cards offer." [3] Under a heading of "Terms and Conditions" in the solicitation letter, the following language appeared:

Annual Percentage Rate 4.9% fixed introductory rate ... 11.90% fixed rate thereafter.[4]

Grasso responded to the solicitation by returning the pre-approved acceptance certificate on August 30, 1993.[5] On the acceptance certification, Grasso indicated she wanted to transfer balances from other credit cards. Shortly thereafter, First USA sent Grasso a booklet of information. Included in that information was her Cardmember Agreement [Agreement]. The letter attached to the booklet requested that Grasso "[p]lease take the time to read [her] Agreement and keep it in a safe place for future reference." [6]

The Agreement specifically states that:

This is the Agreement that establishes the terms of your Cardmember Account ("Account") with First USA Bank ... Please read it carefully and keep it for your records. You do not need to sign this Agreement, but please be sure to sign the back of your Card if you have not already done so. All extensions of credit in connection with your Account are being made by First USA Bank in Wilmington, Delaware. *Any use of your Card or Account confirms your acceptance of the terms and conditions of this Agreement.*[7]

In addition, the Agreement also set forth the following germane provisions:

Termination: We may terminate your privileges under this Agreement or limit your right to make Purchases or obtain Cash Advances at any time (and list your Account in warning bulletins) without notice or liability. If we ask, you must return your Cards and any unused Convenience Checks to us, cut in half. You agree that you will not try to make a Purchase or obtain a Cash Advance after you have been notified that your privilege to use your Account has been terminated.

---

1. Grasso Affidavit, ¶ 4.

2. Exhibit A to Grasso's Affidavit.

3. *Id.*

4. *Id.*

5. A photocopy of the original of this document is part of the record.

6. Exhibit B to Donna Barrett's Affidavit.

7. *Id.* [Emphasis added.]

You may terminate this Agreement at any time. If you do, you must return to us all Cards and Convenience Checks previously issued on the Account. If you call us, we may require that you confirm your intent to terminate in writing. Your or our termination will not affect your existing obligations under this Agreement or your liability for all charges posted to your Account prior to the time all Cards and unused Convenience checks issued on your Account are returned to us.

\* \* \* \* \* \*

Amendments: We can amend the terms of this Agreement at any time. We will notify you by mail of what these amendments are. Subject to the requirements of applicable law, any amendment to this Agreement will become effective at the time stated in our notice to you and the amended terms of this Agreement will apply to all outstanding unpaid indebtedness in your Account as well as new transactions.

\* \* \* \* \* \*

GOVERNING LAW/ASSIGNMENT: THIS AGREEMENT AND YOUR ACCOUNT AS WELL AS OUR RIGHTS AND DUTIES AND YOUR RIGHTS AND DUTIES REGARDING THIS AGREEMENT AND YOUR ACCOUNT, WILL BE GOVERNED BY AND INTERPRETED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE AND, AS APPLICABLE, THE LAWS OF THE UNITED STATES OF AMERICA. YOU AGREE THAT WE MAY AT ANY TIME ASSIGN AND TRANSFER YOUR ACCOUNT, THIS AGREEMENT AND OUR RIGHTS AND OBLIGATIONS HEREUNDER TO OTHERS. THE PERSON(S) TO WHOM WE ASSIGN THIS AGREEMENT SHALL BE ENTITLED TO ALL OF

OUR RIGHTS UNDER THIS AGREEMENT.[8]

After receiving her card and the Agreement initially, Grasso made payments on her transferred balance. Later, she used the First USA credit card for new charge purposes. Grasso's payments history in 1993–94 appears to have been well received. She was initially charged for three late payments, however, she did receive a refund on one of the late payment charges. In addition, Grasso's October 1994 statement read "CONGRATULATIONS! YOUR EXCELLENT CREDIT HISTORY HAS QUALIFIED YOU FOR A CREDIT LINE INCREASE."[9] Grasso's credit history with this account appears to remain about the same. From October 1994 until May 1995, Grasso was charged with three more late fees.[10] Again, however, one of the charged late fees was refunded.

In November 1995, First USA notified Grasso, via an announcement that accompanied her statement, that the terms of her account were to be amended.[11] All proposed changes were to become effective January 1, 1996, on all "current and future balances in both active accounts and accounts that no longer [had] charging privileges."[12] First USA said it was amending its fixed interest rate to a variable rate, which was then 16.99%, and that it was changing the calculation of the interest rate from monthly to daily and was increasing the amount of late fees, over-limit fees and return check fees by $3.00. Lastly, First USA stated it was increasing the amount of their minimum charge on their cash advance from $2.00 to $5.00. The announcement of these amendments came a little over two years after Grasso opened her account.

In its announcement, First USA stated:

EFFECTIVE DATE/NON–ACCEPTANCE INSTRUCTIONS.

---

8. *Id.*

9. Exhibit C to Donna Barrett's Affidavit.

10. Exhibit C to Donna Barrett's Affidavit is missing the following monthly statement: November 1994, December 1994, January 1995 and July 1995.

11. In seeking class action certification and her argument opposing the current motion, Grasso argues that other credit card holders received a similar announcement or treatment.

12. Exhibit D to Donna Barrett's Affidavit.

The changes in terms summarized above will become effective January 1, 1996 (and will apply as of the first day of your billing cycle that includes the January 1, 1996 effective date). The new terms will apply to current and future balances in both active accounts and accounts that no longer have charging privileges. If you do not wish to accept the new terms, you must notify us in writing of your decision by December 31, 1995. Please include your name, address and account number on the correspondence and mail it to: "First USA Bank, P.O. Box 8650, Wilmington, Delaware, 19899–8650". If you give us this notice, your charge privileges will be canceled (if not previously canceled), but you may pay off any outstanding unpaid balance of your Account under your prior terms.[13]

Grasso says she never received this announcement but called later to complain. She wrote to First USA before December 31, 1995. Interestingly, there is no allegation that other members of the putative class she seeks to have certified did not receive this notice.

### PARTIES' CLAIMS

Grasso contends that the original solicitation formed the contract between her and First USA. After a low introductory rate, the solicitation indicated she would be charged a fixed interest rate of 11.9% "thereafter." "Thereafter" means, she says, First USA could not change the interest rate, particularly to a higher variable rate as happened here. Grasso says other credit card holders suffered a similar breach of contract when First USA changed the interest rate. She claims also that by breaching its contract with her, First USA breached a covenant of good faith.

First USA, on the other hand, contends that the Cardmember Agreement is the contract between it and Grasso. That Agreement gave First USA the right to amend with notice, any provision in it, including the interest rate charged and whether the rate would be fixed or variable. It denies it breached any contract it had with Grasso. First USA also argues that if there is no breach of a contract, there cannot be a breach of a covenant of good faith.

### APPLICABLE STANDARD

Summary judgment should be granted when there are no genuine issues of material fact and the moving party is entitled to a judgment as a matter of law.[14] If the record indicates that a material fact is disputed, or if further inquiry into the facts is necessary to clarify the application of the law, summary judgment will not be granted.[15] The burden is on the moving party to show, with reasonable certainty, that no genuine issue of material fact exists and, thus, judgment as a matter of law is permitted.[16] When considering a motion for summary judgment, the facts must be construed in the light most favorable to the non-moving party.[17]

The Agreement establishes Delaware as the law to govern any disputes. Therefore, Delaware law and any applicable federal law will apply. There is no allegation any Delaware or federal statutes or regulations are implicated.

### DISCUSSION

#### Can Summary Judgment be Awarded?

Grasso contends the original solicitation letter to her comprises the contract she has with First USA. Since the record does not yet include that solicitation, she says it is inappropriate to award summary judgment. The affidavit she filed in opposition to First USA's motion, however, states that a subsequent solicitation is identical in all relevant respects to the original solicitation. At oral argument, all counsel agreed, including hers, the two solicitations were the same.

13. *Id.*

14. *Moore v. Sizemore,* Del.Supr., 405 A.2d 679 (1979).

15. *Ebersole v. Lowengrub,* Del.Supr., 180 A.2d 467 (1962).

16. *Martin v. Nealis Motors, Inc.,* Del.Supr., 247 A.2d 831 (1968).

17. *Borish v. Graham,* Del.Super. 655 A.2d 831 (1994).

The Court does not view the absence of the original solicitation as an impediment to consideration of First USA's motion. Most importantly, the Court finds that the Agreement formed the terms of the contract between these two parties. Since Grasso and all counsel agreed to the identical wording of key provisions in the two solicitations, the absence of the original solicitation at this point is not a procedural bar. The Court, however, will examine the solicitation wording in a light most favorable to Grasso.

Grasso indicates in her affidavit that she never received the notice of various changes sent out in or with her November 1995 statement. Donna Barrett, a First USA Senior Vice President, submitted an affidavit indicating the procedure used to send out the notices in the regular course of business. Barrett says there is no indication the notice was not sent out. Unlike the 1993 solicitation document, however, Grasso does not argue that her alleged failure to get this notice means summary judgment cannot be awarded.

### Breach of Contract

Generally, a contract consists of an offer and acceptance. "An offer is the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it."[18] Acquiescence to the terms of the offer generally constitute acceptance. To be effective, the acceptance must be identical to the offer.[19] An act or conduct must show acceptance to an offer but the act must be intentional.[20]

After finding that there has been an offer and acceptance, the Court must determine whether the parties have formed a contract. In other words, the Court must look to the parties objective manifestations of assent rather than their subjective intent.[21] It is unnecessary, therefore, to inquire into the motives of the offeree.[22] This is so because, given the prerequisite manifestation, intent to accept is presumed absent contrary words or conduct.[23]

In the instant case, Grasso received an invitation or solicitation to accept a credit card offer from First USA. She accepted this invitation and sent back the pre-approved acceptance certificate. In the solicitation, First USA informed Grasso that: (1) use of the credit card meant acceptance of and would subject her to the terms of the Agreement, (2) she would be responsible for all charges incurred according to the Agreement, and (3) the terms of her account are subject to change as provided in the Agreement.

█ Even though the Court views the Agreement and not the solicitation as the contract, certain principles of contract interpretation are applicable. The interpretation of a contract is a matter of law.[24] The solicitation, like the Agreement, is much like an insurance contract in that it is not negotiated.[25] As such, the solicitation in this instance will be construed narrowly against First USA.[26]

The terms of the solicitation in light of these principles of interpretation, nevertheless, are clear. The solicitation was to open a credit card/charge account which would be subject to an Agreement which would be sent out with the credit card. Use of the credit card would constitute acceptance of the

**18.** Restatement (Second) of Contracts § 24; *Salisbury v. Credit Serv., Inc.,* Del.Super., 199 A. 674, 681 (1937).

**19.** *Friel v. Jones,* Del.Ch., 206 A.2d 232, 233 (1964), *aff'd per curiam,* Del.Supr., 212 A.2d 609 (1965); *see also* Restatement (Second) of Contracts §§ 58–59.

**20.** *Industrial America, Inc. v. Fulton Indus., Inc.,* Del.Supr., 285 A.2d 412, 415 (1971).

**21.** *Industrial America,* 285 A.2d at 414–15; *see also* John D. Calamari and Joseph M. Perillo, Contracts § 2–13 (3d ed 1987) (*citing Industrial America* ).

**22.** *Id.*

**23.** Restatement (Second) Contracts § 53.

**24.** *Hudson v. State Farm Mut. Ins. Co.,* Del.Supr., 569 A.2d 1168, 1170 (1990).

**25.** *Gray v. American Express,* Ct.App.Dist.D.C., 743 F.2d 10, 17 (1984).

**26.** *Id.;* Restatement (Second) of Contracts § 206.

terms in the Agreement. In addition, the prospective customer was told the Agreement was subject to modification. Finally, the solicitation does not say nor can it be reasonably interpreted to be the terms of a contract between Grasso and First USA. A short time later, Grasso received her credit card, along with First USA's Agreement. The Agreement set forth the terms of the credit card account.

■ The very first sentence of the very first paragraph of the Agreement stated: "This is the Agreement that establishes the terms of your Cardmember Account ...." Several sentences later in the first paragraph, it states: "Any use of your Card or Account confirms the acceptance of the terms and conditions of this Agreement." Alone, this language establishes that First USA's offer as contained in the Agreement, constitutes the terms of the contract and establishes that using the card or account means the offer has been accepted.

The Agreement itself was merely an offer to extend credit. Grasso did not have to accept its terms. Without any penalty or obligation, she merely could refrain from using the account by making payments on the transferred balance or by not using the credit card.[27] Grasso's first statement from First USA in October 1993 reflects the transfer of balances due on other credit cards to her new First USA account. In October 1993 she made her first payment on those balances. She used her credit card for the first time in February 1994. By either act, but certainly by both, Grasso unequivocally manifested acceptance of the Agreement's terms, that is, acceptance of First USA's offer to extend credit.[28]

The Agreement provided either party could terminate it. The Agreement also provided that First USA could amend it at any time, subject to applicable law. The applica-ble law for the Agreement was Delaware and federal law. Grasso has not complained that any statutory provision was violated. Delaware law provides that there be notice of the amendment.[29]

The paragraph providing for amendments to the Agreement also states, "any amendment to this Agreement will become effective at the time stated in our notice to you and the amended terms of this Agreement will apply to all outstanding unpaid indebtedness in your Account as well as new transactions."[30]

First USA indicates that it sent out notices in the November 1995 statements of various credit card holders, including Grasso. The notices informed the recipients that First USA was making several modifications in the Agreement, including changing the fixed rate to a variable, and higher, rate and other changes. The notice also contained this provision:

EFFECTIVE DATE/NON–ACCEPTANCE INSTRUCTIONS.

The changes in terms summarized above will become effective January 1, 1996 (and will apply as of the first day of your billing cycle that includes the January 1, 1996 effective date). The new terms will apply to current and future balances in both active accounts and accounts that no longer have charging privileges. If you do not wish to accept the new terms, you must notify us in writing of your decision by December 31, 1995. Please include your name, address and account number on the correspondence and mail it to: "First USA Bank, P.O. Box 8650, Wilmington, Delaware, 19899–8650". If you give us this notice, your charge privileges will be canceled (if not previously canceled), but you may pay off any outstanding unpaid balance of your Account under your prior terms.[31]

**27.** *Novack v. Cities Service Oil Co.*, N.J.Super., 149 N.J.Super. 542, 374 A.2d 89, 93 (1977); *aff'd* N.J.Super.A.D., 159 N.J.Super. 400, 388 A.2d 264 (1978).

**28.** *City Stores Co. v. Henderson*, 116 Ga.App. 114, 156 S.E.2d 818, 823 (1967); *Garber v. Harris Trust & Sav. Bank*, Ill.App.Ct., 104 Ill.App.3d 675, 60 Ill.Dec. 410, 432 N.E.2d 1309, 1315 (1982).

**29.** *5 Del. C.* § 952.

**30.** Cardmember Agreement, Exhibit B to Donna Barrett's Affidavit.

**31.** Exhibit D to Donna Barrett's Affidavit.

In addition, 5 *Del. C.* § 952 which governs the rules for amendments to revolving credit, provides:

(b)(2) If the amendment has the effect of increasing the periodic interest or interest charges to be paid by the borrower, such amendment shall, except as otherwise provided for herein, become effective as to a particular borrower as of the first day of the billing cycle during which the effective date of the amendment occurs or as of any later date, in either case, in accordance with this section and as stipulated in the notice, so long as the borrower does not, within 30 days of the earlier of the mailing or delivery of the notice of the amendment, furnish written notice to the bank that the borrower does not agree to accept such amendment. The notice from the bank shall include a statement that, absent the borrower's written notice to the bank within 30 days of the earlier of the mailing or delivery of the notice of the amendment, that such borrower does not agree to accept such amendment, the proposed amendment will become effective and apply to such borrower and such borrower's account, and the address to which a borrower may send notice of the borrower's election not to accept the amendment. Any borrower who gives a timely notice electing not to accept an amendment shall be permitted to pay the outstanding unpaid indebtedness in such borrower's account under the plan in accordance with the terms of the agreement governing the plan without giving effect to the amendment; provided, however, that if the borrower does not agree to accept such proposed amendment, the bank may convert the borrower's account to a closed end credit account as governed by subchapter III of this chapter, on credit terms substantially identical to or more favorable to the borrower than those set forth in the then-existing agreement governing the borrower's account and the borrower will continue to be subject to the terms of the existing agreement or the more favorable terms until the borrower's account balance is paid in full.

\* \* \* \* \* \*

(c) If the terms of the agreement governing the plan, as originally drawn or as amended pursuant to this section, so provide any amendment may, on and after the date upon which it becomes effective as to a particular borrower, apply to all then outstanding unpaid indebtedness in the borrower's account under the plan, including any such indebtedness which shall have arisen out of purchases made or loans obtained prior to the effective date of the amendment.

First USA's notification of its proposed amendment comports with the statutory requirements set forth above and Grasso does not argue that the method of amendment or the terms of the amendment violate Delaware law.

In her affidavit, Grasso declares that she does not remember receiving such a notice. That notice would have accompanied her November 28, 1995, monthly billing statement. Grasso made a payment of $100 on December 30, 1996, in response to her November monthly billing statement. This payment is evidence that Grasso received that statement.

This case is being heard on First USA's motion for summary judgment. That posture mandates this Court to resolve in Grasso's favor at this point any doubt about whether she did or did not receive the notice of the amendments. As noted earlier, however, she does not argue that her lack of recollection of receiving the notice bars an award of summary judgment.[32] Grasso's December payment in response to the November bill probably explains why she does not argue that her lack of recall bars summary judgment.

Another reason for this apparent silence is Grasso's claim that the original solicitation constitutes the contract. As such, she argues First USA is locked into 11.9% forever.

---

32. One of Grasso's attorneys filed an affidavit in response to First USA's motion. He argues that the absence of the original solicitation document creates a genuine issue of material fact. He does not argue that his client's lack of recollection of receiving the November 1995 notice bars summary judgment. Affidavit of Jordan Lewis, Esq.

Even if she recalled receiving the notice in November, she would, and does, argue it is ineffective in changing the solicitation's terms.

The unrefuted record does not assist her even [33] at this stage. Grasso's bill for December 1995 (with a due date of January 22, 1996) reflects a December purchase and the 11.9% interest rate. The next bill, which covers January, reflects several payments and the new variable rate, then at 17.86%. The next month's bill reflected a variable rate of 16.99%. It also reflects a payment on March 1, 1996, of $5,237.24. Grasso paid off her bill on April 26, 1996. Obviously, therefore, the gravamen of her complaint is as stated: First USA cannot ever amend the 11.9% interest rate. There is no need to resolve the issue of whether she did or did not receive the notice in November.

The Agreement gave either party the right to terminate their relationship. That alone provided a method for First USA to cease charging 11.9%. The Agreement provided a process whereby First USA could amend the terms and conditions and clearly enough advised Grasso that those amendments would apply to outstanding unpaid balances. Since the Agreement formed the basis of the contract between these parties, Grasso was on notice that (1) it could be amended and (2) any amendment would include unpaid balances.[34]

First USA amended the contract in accordance with the terms of the Agreement and all applicable laws and regulations. There was no breach of contract.[35]

Grasso also argues that she should be allowed further discovery about First USA's decision to offer a fixed rate, then terminate it. The Court does not see how this request is relevant. It is based on her theory that the solicitation is the contract, ignoring the clear and express provisions in the Agreement. It also ignores that the fixed rate was in effect for over two years. The implication of Grasso's request is that there was a bait and switch. The length of time of the fixed rate and the realities of the market place do not support the need for this request.

### Breach of Covenant of Good Faith

The Court has found that there was no breach of contract. The terms of the Agreement expressly covered the matter at issue. Therefore, there can be no breach of any covenant of good faith.[36]

### CONCLUSION

For the reasons stated herein, First USA Bank's motion for summary judgment is **GRANTED**.

---

33. Similarly, to argue she did not receive the amendment notice but other cardholders did would undercut her request to have this matter declared a class action.

34. Exhibit D to Donna Barrett's Affidavit.

35. *Beck v. First Nat'l Bank of Minneapolis*, Minn. Supr., 270 N.W.2d 281 (1978).

36. *Dave Greytak Enterprises, Inc. v. Mazda Motors of America, Inc.*, Del.Ch., 622 A.2d 14, 23 (1992); *aff'd sub nom*, Del.Supr., No. 64, 1992, Holland, J., 1992 WL 135147 (March 16, 1992) (ORDER).