OPINION
{¶ 1} Defendants-appellants Bank One Corporation and First USA Bank, National Association appeal from the October 16, 2003, Judgment Entry of the Richland County Court of Common Pleas.
 STATEMENT OF THE FACTS AND CASE {¶ 2} In January of 1991, appellee Patricia Nefores was issued a credit card account by FCC National Bank. The First Card Cardmember Agreement and Disclosure Statement stated, in pertinent part, as follows:
 {¶ 3} "14. Change In Terms — We can change the terms of this agreement at any time provided we send you notice at least 15 days prior to the effective date of the change."
 {¶ 4} In December of 1998, FCC National Bank amended the terms of appellee's Cardmember Agreement. A document captioned "NOTICE OF CHANGE IN TERMS TO YOUR FIRST CARD CARDMEMBER AGREEMENT" was allegedly sent to appellee with her account billing statement in December of 1998. The document contained an arbitration clause stating as follows:
 {¶ 5} "Immediately after the section of your Agreement entitled Collection Costs, a section will be added REQUIRING THAT ANY DISPUTE BETWEEN YOU AND US BE RESOLVED BY ARBITRATION:
 {¶ 6} "Arbitration — Any claim, dispute or controversy ("Claim") by either you or us against the other, or against the employees, agents or assigns of the other, arising from or relating in any way to this Agreement or your account, including Claims regarding the applicability of this arbitration clause or the validity of the entire Agreement, shall be resolved by binding arbitration by the National Arbitration Forum, under the Code of Procedure in effect at the time the Claim is filed. Rules and forms of the National Arbitration Forum may be obtained and claims may be filed at any National Arbitration Forum office, www.arb-forum.com, or P.O. Box 55405, telephone 1-800-4742371. Any arbitration hearing at which you appear will take place at a location within the federal judicial district that includes your billing address at the time the Claim is filed. This arbitration agreement is made pursuant to a transaction involving interstate commerce, and shall be governed by the Federal Arbitration Act, 9 U.S.C. Sec. 1-16. Judgment upon any arbitration award may be entered in any court having jurisdiction.
 {¶ 7} "This arbitration agreement applies to all Claims now in existence or that may arise in the future except for: (i) Claims that you or we individually filed in a court before the effective date of the amendment of the agreement adding this arbitration agreement; (ii) Claims advanced in any judicial class actions that have been finally certified as class actions and where notice of class membership has been given as directed by the court before the effective date of the amendment of the Agreement adding this arbitration agreement; (iii) Claims by or against any unaffiliated third party to whom ownership of your account may be assigned after default (unless that party elects to arbitrate). Nothing in this agreement shall be construed to prevent any party's use of (or advancement of any Claims, defenses or offsets in) bankruptcy or repossession, replevin, judicial foreclosure or any other prejudgment or provisional remedy relating to any collateral, security or other property interests for contractural debts now or hereafter owned by either party to the other under this Agreement.
{¶ 8} In the absence of this arbitration agreement, you and wemay otherwise have had a right or opportunity to litigate claimsthrough a court before a judge or a jury, and/or to participateor be represented in litigation filed in court by others(including class actions), but except as otherwise providedabove, those rights, including any right to a jury trial, arewaived and all claims must now be resolved through arbitration."
 {¶ 9} The document further sets forth the following procedure for rejecting the new terms of the Cardmember Agreement:
 {¶ 10} "The above terms will apply to your account unless by February 14, 1999, you provide written notice which (i) states that you wish to close your account and do not wish to accept these changes and (ii) includes your name, address and account number. . . .
 {¶ 11} "Additionally, if you use your First Card account after February 14, 1999, you will be considered to have agreed to the new terms, and they will become applicable to your account even if you have sent us written notice to the contrary." Such notice was mailed to appellee along with her December, 1998, billing statement. Appellee, in the case sub judice, never sent any notice rejecting the new terms of the Cardmember Agreement. Appellee had been notified in June of 1999 that, effective September 17, 1999, her Cardmember Agreement was being modified to reflect First USA as the issuer of her First Card credit card account.
 {¶ 12} After FCC National Bank merged with appellant First USA Bank, National Association, appellee's account was transferred in September of 1999 to appellant First USA Bank, National Association. Appellant First USA is a wholly owned subsidiary of appellant Bank One Corporation.
 {¶ 13} On or about January of 1999, a charge in the amount of $69.95 appeared on appellee's credit card account for membership in CTW (Children's Television Workshop) Kid's Club. Thereafter, on October 2, 2000, appellee filed a complaint against appellant BrandDirect Marketing, Inc. Appellee, in her complaint, alleged that BrandDirect Marketing caused the charge to be billed to appellee's credit card account without appellee's permission or authorization and that BrandDirect Marketing "illegally gained access to said credit card information, causing the same to be used to solicit and market CTW's Kid's Club membership and to charge plaintiff's credit card without authorization." Subsequently, appellee, with leave of court, filed an amended complaint adding appellants Bank One Corporation and First USA Bank, National Association as defendants. Appellee's amended complaint, which contained class action allegations, alleged that the above appellants provided personal and private financial information to BrandDirect Marketing about her credit card account. Appellee specifically set forth claims against appellants Bank One Corporation and First USA Bank, National Association alleging invasion of privacy, fraud and bad faith. Appellee, in her complaint, sought over $25,000.00 in compensatory damages, as well as punitive damages and an award of attorney fees.
 {¶ 14} Appellants Bank One Corporation and First USA Bank, National Association, on December 14, 2001, filed a Motion to Compel Arbitration and Stay Proceeding. Appellee filed a memorandum in opposition to appellants' motion on January 11, 2002, arguing, in part, that the subject arbitration clause was unenforceable since "one-sided arbitration clauses forced on the consumer via an adhesion contract are unenforceable in Ohio as against public policy." Appellants filed a reply brief on January 22, 2002.
 {¶ 15} As memorialized in an Order filed on January 28, 2002, the trial court overruled the Motion to Compel Arbitration and Stay Proceeding. The trial court, in its order, specifically found, in part, that appellee's claim that "the two bank defendants converted personal information about her and sold it to the third defendant" was "not a claim relating to the agreement or plaintiff's account." Since the trial court denied the Motion to Compel Arbitration on such basis, it did not expressly find that the arbitration clause at issue was valid and enforceable.
 {¶ 16} Appellant then filed an appeal from the trial court's January 28, 2002, Order. As memorialized in an Opinion filed on September 3, 2003, in Nefores v. BrandDirect Marketing, Inc., Richland App. No. 02-CA-0012, 2002-Ohio-4841, this Court reversed the judgment of the trial court, finding that that appellee's claims were covered by the arbitration clause. We further remanded the matter to the trial court "for determination as to whether, as appellee alleges, the subject arbitration clause is a "one-sided" adhesion clause".
 {¶ 17} Thereafter, on remand, the trial court held an oral hearing on the issue of whether the arbitration clause was an adhesion clause. As memorialized in a Judgment Entry filed on October 16, 2003, the trial court held that the arbitration clause was an unenforceable adhesion contract. In so holding, the trial court stated, in relevant part, as follows:
 {¶ 18} "In conclusion, the arbitration clause relied upon by the defendant banks in this case is an unenforceable adhesion contract. The way in which it was promulgated was procedurally unfair. There was no bargaining. It was sent out in an envelope stuffer. It was presented in a way that was calculated to make the credit consumer's knowledge and assent to the bank's amendments both unlikely and irrelevant. It is also substantively unfair. It preserves the bank's right to pursue its customary litigation against consumers but binds the consumer to resort to arbitration to vindicate the consumer's rights. Furthermore, that arbitration clause substantially discourages consumer claims through high fees and other unfavorable procedures as compared with other avenues of dispute resolution."
 {¶ 19} It is from the trial court's October 16, 2003, Judgment Entry that appellants now appeal, raising the following assignment of error:
 {¶ 20} "The court below erred in denying the motion of defendants-appellants to compel arbitration and stay proceedings."
 I {¶ 21} Appellants, in their sole assignment of error, argue that the trial court erred in denying appellants' Motion to Compel Arbitration and Stay Proceedings. Appellants specifically contend that the trial court erred in invalidating the subject arbitration agreement on the ground that the arbitration agreement is an unconscionable adhesion contract. We disagree.
 {¶ 22} As an initial matter, we note that there is no dispute that the arbitration agreement is an adhesion contract. Appellants conceded as much at the oral argument in this matter. Black's Law Dictionary (5 Ed. 1979) 38, defines an adhesion contract as a "standardized contract form offered to consumers of goods and services on essentially `take it or leave it' basis without affording consumer realistic opportunity to bargain and under such conditions that consumer cannot obtain desired product or services except by acquiescing in form contract." Sekeres v.Arbaugh (1987), 31 Ohio St.3d 24, 31, 508 N.E.2d 941 (H. Brown, J., dissenting), quoting Wheeler v. St. Joseph Hosp. (1976),63 Cal.App.3d 345, 356, 133 Cal.Rptr. 775.
 {¶ 23} Thus, the crucial issue in the case sub judice is whether the arbitration agreement is unconscionable. Under Ohio law, a contract clause is unconscionable where there is the absence of meaningful choice on the part of one of the parties to a contract, combined with contract terms that are unreasonably favorable to the other party. Collins v. Click Camera and Video,Inc. (1993), 86 Ohio App.3d 826, 834, 621 N.E.2d 1294.
 {¶ 24} Unconscionability embodies two separate concepts: (1) substantive unconscionability, i.e. "those factors which relate to the contract terms themselves and whether they are commercially reasonable," Id. at 834, and (2) procedural unconscionabilty, i.e. "those factors bearing on the relative bargaining position of the contracting parties." Id. InCollins, the court explained the difference between the two concepts as follows:
 {¶ 25} "Substantive unconscionability involves those factors which relate to the contract terms themselves and whether they are commercially reasonable. Because the determination of commercial reasonableness varies with the content of the contract terms at issue in any given case, no generally accepted list of factors has been developed for this category of unconscionability. However, courts examining whether a particular limitations clause is substantively unconscionable have considered the following factors: the fairness of the terms, the charge for the service rendered, the standard in the industry, and the ability to accurately predict the extent of future liability. . . . .
 {¶ 26} "Procedural unconscionability involves those factors bearing on the relative bargaining position of the contracting parties, e.g., "age, education, intelligence, business acumen and experience, relative bargaining power, who drafted the contract, whether the terms were explained to the weaker party, whether alterations in the printed terms were possible, whether there were alternative sources of supply for the goods in question." Id. at 834. (Citations omitted).
 {¶ 27} The issue of unconscionability is a question of law. See Ins. Co. of North Am. v. Automatic Sprinkler Corp. (1981),67 Ohio St.2d 91, 98, 423 N.E.2d 151.
PROCEDURAL UNCONSCIONABILITY
 {¶ 28} In the case sub judice, the trial court, in holding that the arbitration clause was unconscionable, focused, in part, on the manner in which appellee received notification of the arbitration agreement. The trial court noted that the arbitration agreement was not contained in the original Cardmember Agreement, but rather was included in a separate notice mailed to appellee along with her December, 1998, billing statement. The trial court, in its October 16, 2003, entry, found that that the amendment adding the arbitration agreement "came in the form of a unilateral amendment" with "no requirement of a clear notice or actual consent" and was promulgated "in a way highly unlikely to bring it to Ms. Nefores' [appellee's] attention."
 {¶ 29} In the case sub judice, the Cardmember Agreement provides that Delaware law applies. Del. Code Ann. Title 5, Section 952(a) states, in relevant part, as follows: "Unless the agreement governing a revolving credit plan otherwise provides, a bank may at any time and from time to time amend such agreement in any respect, whether or not the amendment or the subject of the amendment was originally contemplated or addressed by the parties or is integral to the relationship between the parties. Without limiting the foregoing, such amendment may change terms by the addition of new terms or by the deletion or modification of existing terms, whether relating to . . . arbitration or other alternative dispute resolution mechanisms, or other matters of any kind whatsoever." (Emphasis added). This section clearly permits the amendment of a credit card agreement to add an arbitration clause.
 {¶ 30} Provided that there is an "opt-out" provision that permits card holders such as appellee the choice to either accept or reject the amendment, courts have generally upheld Delaware's statutory scheme of permitting banks to unilaterally amend cardmember agreements to include arbitration agreements. "The opt-out availability has been held valid as a means of enforcing the ability to amend the credit card agreement." See Joseph v.M.B.N.A. America Bank, N.A., 148 Ohio App.3d 660, 663
2002-Ohio-4090,[1] 775 N.E.2d 550. See also Edelist v.MBNA Am. Bank (Del.Sup.Ct. 2001), 790 A.2d 1249; Johnson v.Chase Manhatten Bank USA (N.Y.Sup.), 2 Misc.3d 1003(A), 2004 N.Y. Slip Op. 50086(U), 2004 WL 413213.
 {¶ 31} As is stated above, in the case sub judice, the original Cardmember Agreement stated that "[w]e can change the terms of this agreement at any time provided we send you notice . . .'" Thereafter, the subject arbitration provision was added pursuant to a "Notice of Change in Terms to Your First Card Cardmember Agreement" that was sent to appellee with her account billing statement in December of 1998. This method (i.e. — including the amendment in a mailing to credit card holders) of providing notice of an amendment to a credit card agreement to provide for arbitration of disputes has been upheld by numerous courts. See Joseph, supra. at 664; Grasso v. First USA Bank
(Del.Super.Ct. 1998), 713 A.2d 305, 310.
 {¶ 32} The notice of amendment sent to appellee further included the following procedure for opting out of the new terms of the Cardmember Agreement:
 {¶ 33} "The above terms will apply to your account unless by February 14, 1999, you provide written notice which (i) states that you wish to close your account and do not wish to accept these changes and (ii) includes your name, address and account number. . . . There is no dispute that appellee did not exercise this "opt-out" procedure. As a result, appellee is bound by the amendment to the credit card agreement. See Joseph, supra. See also Bank One, N.A. v. Coates (S.D. Miss. 2001),125 F. Supp.2d 819. In Coates, a United States District Court, applying Ohio law, held that since the original cardholder agreement permitted amendments, Bank One could validly amend its agreement to include an arbitration clause. The Court, in Coates, noted that while there was language in the notification of the amendment giving the cardholder the option of rejecting the arbitration provision, the cardholder in Coates, did not exercise the same.[2]
 {¶ 34} Numerous other courts have also upheld First USABank's arbitration provision. See, for example, Marsh v. FirstUSA Bank, N.A. (N.D. Tex. 2000) 103 F. Supp.2d 909; Hale v.First USA Bank, N.A., (S.D.N.Y. 2001) 2001 WL 687371.
SUBSTANTIVE UNCONSCIONABILITY
 {¶ 35} The trial court, in holding that the arbitration agreement was unenforceable, also emphasized that "[t]he most striking incident of unfairness of that arbitration is not actually mutual." The trial court noted that while a consumer, such as appellee, could not sue the bank, the bank, in the arbitration agreement, reserved the right to sue the consumer.
 {¶ 36} In the case sub judice, the arbitration agreement states, in relevant part, as follows: [a]ny claim, dispute or controversy ("Claim") by either you or us against the other, . . . arising from or relating in any way to this Agreement or your account, including Claims regarding the applicability of this arbitration clause or the validity of the entire Agreement, shall be resolved by binding arbitration. . . ." Thus, the arbitration agreement would appear to apply mutually to both appellee and appellants. However, both appellee and the trial court point to the following language in the arbitration agreement as evidence that arbitration is not actually mutual: "[n]othing in this agreement shall be construed to prevent any party's use of (or advancement of any Claims, defenses or offsets in) bankruptcy or repossession, replevin, judicial foreclosure or any other prejudgment or provisional remedy relating to any collateral, security or other property interests for contractual debts now or hereafter owned by either party to the other under this Agreement." According to appellee, this language "ensures special legal remedies for the bank while requiring the consumer to pursue all claims in arbitration."
 {¶ 37} However, the court in Hale, supra. rejected the argument that such language in an arbitration agreement rendered the same unconscionable and unenforceable. The court, in Hale,
specifically stated, in relevant part, as follows: "These are reasonable exceptions to the requirement of arbitration which cannot be viewed as so one-sided as to be unconscionable. The agreement does not prevent either party's use of bankruptcy, but that is likely to be a remedy used by the cardholder rather than First USA. If there is a bankruptcy proceeding, neither party is required to arbitrate any claim or defense in bankruptcy. The agreement is not binding on an asignee [sic] to whom ownership of the cardholder's account is assigned after default unless the assignee agrees to arbitrate. But neither the cardholder nor the assignee is required to arbitrate any claims against the other and thus this provision cannot be viewed as so unconscionable as to render the arbitration agreement unenforceable. Finally, the remaining provisional remedies that are excepted refer to collateral security or property interests that would apply to secured credit which was not involved in this case." Id. at 6.
 {¶ 38} Moreover, courts have held that mutuality is not a requirement for a valid arbitration clause, provided that the underlying contract is supported by consideration. As noted by the court in Joseph, supra: "In Pick v. Discover Fin.Serv.,[3] the court considered the same issue concerning the consideration to support the amendment of a credit card agreement to include an arbitration clause and stated:
 {¶ 39} ". . . The court finds that the Agreement, pursuant to which plaintiff received the benefits of the Card and defendant gained plaintiff's subscription, is supported by adequate consideration. Therefore, no mutuality is necessary to ensure validity of the Arbitration Section." See, also, Bank One, N.A.v. Coates (S.D.Miss. 2001), 125 F.Supp.2d 819, fn. 7; . . ."Joseph, supra. at 664-665.
 {¶ 40} The trial court, in its entry holding that the arbitration agreement was unconscionable and unenforceable, also emphasized, in part, that the National Arbitration Forum (NAF), the forum selected by appellants, is not a favorable forum for consumer claims because of the high filing and hearing costs.[4]
 {¶ 41} In Green Tree Financial Corp. v. Randolph, (2001),531 U.S. 79, 121 S.Ct. 513, the Supreme Court recently recognized that "the existence of large arbitration costs could preclude a litigant . . . from effectively vindicating her federal statutory rights in the arbitrable forum." Id. at 90. The Court went on to hold, however, that "where . . . a party seeks to invalidate an arbitration agreement on the ground that arbitration would be prohibitively expensive, that party bears the burden of showing the likelihood of incurring such costs." Id. at 92.
 {¶ 42} Appellee, in this matter, asserts that her claim is worth $100,000.00.[5] Rule 44(A) of the NAF Code of Procedure states that a party "may not file a Claim or proceed with an arbitration unless the fees provide in the Fee Schedule are timely paid to the Forum." Under the 2003 National Arbitration Forum (NAF) Code of Procedure,[6] there are two different arbitration fee schedules. While claims valued at under $75,000.00 are referred to as "Common Claims", claims valued in excess of such amount are referred to as "Large Claims." The filing fees for the two different types of claims differ. For example, under the fee schedules, the filing fee for a claim valued between $50,001.00 and $74,999.00, is $240.00 whereas the filing fee for a claim worth between $75,000.00 and $100,000.00 is $750.00 plus 1% of the excess over $75,000.00. As the amount of the claim increases in value, the amount of the filing fee increases also. The higher the value of a claim, the higher the filing fees.
 {¶ 43} In addition, there are additional costs associated with a "Large Claim" such as appellee's. In order to have a "Document Hearing"[7] of a claim valued at between $75,000.00 and $100,000.00, a claimant must pay a hearing fee of $2,500.00. In contrast, the hearing fee for a "Participatory Hearing" for a claim valued at between $75,000.00 and $100,000.00 is $2,500.00 for the initial session plus $1,000.00 for each additional session. Additionally, there are a number of other "Large Claim" fees associated with arbitration:
 {¶ 44} "Request for Amendment $ 150
 {¶ 45} "Request for Subpoena $ 75
 {¶ 46} "Request for Discovery Order $ 150
 {¶ 47} "Request to Director for Time $ 100 Extension
 {¶ 48} "Request to Arbitrator for Time Extension or Stay $ 200
 {¶ 47} Submission of Post-Hearing A fee equal to one-half the Memoranda fee for one Hearing Session
 {¶ 48} "Request for Reopening $ 500 or Reconsideration
 {¶ 49} "Request for Other Orders: $ 500 Dispositive Orders A Non-dispositive Orders
 {¶ 50} As appellee notes in her brief, the fee schedules discourage claimants from valuing their claims appropriately since "if a claimant cannot afford the exorbitant fees associated with the true value of her claim,[8] she must voluntarily limit herself to a lesser, more affordable amount — an amount that still imposes hundreds of dollars of costs."
 {¶ 51} Rule 45 of the NAF Code of Procedure provides for the waiver of specified fees. Such section states, in relevant part, that "[a]n indigent Consumer Party may request a waiver of Common Claim Filing Fees, Request Fees, Hearing Fees, or security for any arbitration, by filing with the Director a written Request for a waiver at the time payment is due." The rule further provides, in subsection B., that the Director `shall promptly determine whether a Consumer Party is eligible for a full or partial waiver . . ." and that, if the Director determines that the same is eligible for either a full or partial waiver, "the Director may order that the business Party pay the appropriate fees."
 {¶ 52} The Ninth District Court of Appeals, in a recent case reviewing the NAF Code of Procedure, held that an arbitration clause in a motor vehicle purchase agreement was substantively unconscionable due to prohibitive costs. See Eagle v. FredMartin Motor Co., 157 Ohio App.3d 150, 2004-Ohio-829,809 N.E.2d 1161. The appellant, in Eagle, an automobile buyer, sued a car dealership for unfair and deceptive consumer sales practices. In Eagle, the appellant specifically sought a declaratory judgment that the arbitration clause in the purchase agreement was unconscionable and unenforceable based, in part, on prohibitive costs. The arbitration clause in Eagle specifically provided that arbitration would be conducted by NAF under its Code of Procedure.
 {¶ 53} In holding the arbitration clause unconscionable, the court, in Eagle, stated, in part, as follows:
 {¶ 54} "We observe that this rule states that the Director "may" order a business party to the arbitration to pay an indigent's fees. Additionally, the rule provides for either a full or partial waiver of fees for an indigent consumer claimant. Thus, not only is the waiver of an indigent consumer's fees, according to the plain language of the rule, discretionary, but the NAF Director also possesses the discretion to award less than a full waiver of such fees. Thus, under the NAF Code of Procedure, an indigent party is not necessarily guaranteed a waiver of all the fees that he or she would be required to pay in arbitration. More importantly for the instant case, however, is the fact that Rule 5(A) does not state that "Large Claim" fees may be waived; rather, the rule only explicitly provides for the waiver of "Common Claim" fees. Since Ms. Eagle asserts her damages are $75,000.00 or greater, her claim is categorized as a "Large Claim" under the NAF fee schedule. Thus, assuming that Ms. Eagle would even qualify for indigent status, her Large Claim fees are not expressly waivable under the NAF Code of Procedure." Id. at 170-171.
 {¶ 55} In Eagle, supra., the court further noted that the arbitration costs would deter low-income individuals who are not indigent from pursuing arbitration. In such case, the court, in holding the arbitration clause unenforceable, noted that Ms. Eagle was a single mother with one child earning approximately $20,000.00 per year and that it was "doubtful" that she would be willing and able to pay the estimated $4,000.00 to $6,000.00 in arbitration fees and costs.
 {¶ 56} In the case sub judice, there is no evidence as to appellee's annual income. However, appellee, in an affidavit attached to her brief in opposition to appellant's Motion to Compel Arbitration and to Stay Proceedings, stated, in relevant part, as follows:
 {¶ 57} "After speaking to my attorneys, it is also my understanding that the particular arbitration that the defendants are trying to force me to go to is extraordinarily expensive and may, in fact, prevent me from being able to pursue my claims against them at all. Specifically, between the costs of filing a claim, requesting a hearing and other miscellaneous fees associated with this particular arbitration, I would be expected to pay at least Two Thousand Five Hundred Dollars (2500.00) or more, up front, in order to pursue my claims. I do not have the financial resources necessary to absorb such costs and would have to forego pursing [sic] these claims if I was forced to pay that amount."
 {¶ 58} Based on the foregoing, we find that the arbitration costs and fees in this case are prohibitive, unreasonable and unfair as applied to appellee and that, for such reason, the arbitration agreement is substantively unconscionable. SeeEagle, supra.
 {¶ 59} Appellants' sole assignment of error is, therefore, overruled,
 {¶ 60} Accordingly, the judgment of the Richland County Court of Common Pleas is affirmed.
Edwards, J., Gwin, P.J. and Wise, J. concur.
For the reasons stated in our accompanying Memorandum-Opinion on file, the judgment of the Richland County Court of Common Pleas is affirmed. Costs assessed to appellants.
[1] The Joseph case also involved a claim by a credit card holder against a credit card company and involved the validity of an arbitration agreement contained in an amendment to the credit card agreement.
[2] See also Mantiply v. First USA Bank, N.A. (Ala. Cir. Ct. 2000), Civ. Action No. 99-1055, in which the court held that the plaintiff "agreed to be bound to the Arbitration Provision by failing to notify First USA of her refusal to accept the amendments [adding an arbitration provision] and by continuing to make charges on her VISA account . . . Failure to object to the terms provided in the Notice, coupled with the use of the credit card after the effective date of the amendments is objective evidence of the cardmember's assent."
[3] The complete citation is Pick v. Discover Fin. Serv., Inc
(D. Del. 2001), 2001 WL 1180278.
[4] While appellants argue that such issue is moot because appellee First USA has agreed to pay the arbitration expenses, we concur with the trial court that we must deal with the arbitration agreement as written.
[5] As is stated above, appellee is seeking both compensatory and punitive damages.
[6] At the hearing before the trial court, appellee did not object to appellant's stipulation that the 2003 Code of Procedure applied.
[7] A "Document Hearing" is defined in the Code as a "proceeding in which an Arbitrator reviews documents of property to render an Order or Award and the Parties do not attend."
[8] Under Rule 27 the 2003 Code of Procedure, an arbitration award cannot exceed the money or relief requested in a claim.